**2015 BNH 007**        Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                      Bk. No. 14-11559-BAH
                                                            Chapter 13
David Harry Robinson, Sr. and
Kathleen Frances Robinson,
              Debtors


*Raymond J. DiLucci, Esq.*
*Raymond J. DiLucci, P.A.*
*Concord, New Hampshire*
*Attorney for Debtors*

*Jillian E. Colby, Esq.*
*Kalil & LaCount*
*Rye, New Hampshire*
*Attorney for Creditor Merrimack*
*Valley Federal Credit Union*


# MEMORANDUM OPINION

## I.    INTRODUCTION

The Court has before it the Motion to Determine Secured Status and Void Wholly

Unsecured Lien Under 11 U.S.C. §§ 1322(b)(2) and 506(a) (Doc. No. 23) (the "Motion") filed

by David Harry Robinson, Sr. and Kathleen Frances Robinson, the debtors in the above-

captioned chapter 13 proceeding (the "Debtors"), through which they seek to void the second

mortgage lien held by Merrimack Valley Federal Credit Union (the "Bank") against their

primary residence.  More specifically, pursuant to the Motion, the Debtors seek to determine the

secured status of the Bank's claim under 11 U.S.C. § 506(a)[1] and to modify the residential real

---

[1]  Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101,
<u>et seq</u>., as amended.

property lien rights of the Bank by voiding its lien as wholly unsecured in accordance with 11 U.S.C. § 1322(b)(2).[2]  The Bank objected to the Motion (Doc. No. 31) (the "Objection") asserting that its claim is not wholly unsecured based on its valuation of the Debtors' property. The Court held an evidentiary hearing on the Motion on the sole issue of the value of the Bank's collateral.

Upon consideration of the appraisals submitted and testimony given, the Court concludes that the Debtors' property is worth more than $278,264.84, the amount of the Bank's first mortgage, triggering the anti-modification provision of § 1322(b)(2) with respect to the Bank's second mortgage.  Accordingly, since the Court determines that the value of the Debtors' property exceeds the debt owed on the first mortgage, the Bank's junior lien remains unaffected, riding through the bankruptcy proceeding, and the Debtors' Motion must, therefore, be denied.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.   FACTS

The Debtors' real estate, which is their primary residence, is located at 683 Browns Ridge Road, Wolfeboro, New Hampshire (the "Property").  The Property is located in the northern part of the Town of Wolfeboro, within close proximity to Route 16.  The Debtors' street forms part of the border between Wolfeboro and neighboring Ossipee.  The Property was built in 2000 and sits on 7.89 acres.  It is a one and three-quarter story cape with an attached two-car garage, front farmer's porch, and screened-in back porch.  The Property also has a three room in-law

---

[2]  Section 1322(b)(2) of the Code provides that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence…."  11 U.S.C. § 1322(b)(2).

apartment located above the garage, which is accessed from the interior of the residence.  The lot is a legal, non-conforming parcel with three hundred feet of frontage and one thousand feet of depth.   The Property is on a ridge, with a mountain view across a valley from the back of the lot. There is also an electric line easement running through the rear of the Property.

According to both the Debtors' and the Bank's appraisers, the condition of the Property and the quality of construction of the dwelling are average, and the lot's long, narrow shape affects its utility and diminishes the value of the otherwise large, multi-acre lot.  Agreement between the appraisers ends on these points, however, as they differ vastly regarding some of the other most basic attributes of the Property, including the number of rooms and the size of the gross living area.  The Debtors' appraiser contends the Property has seven rooms, consisting of three bedrooms and two and one-half baths, with 2,441 square feet of gross living area.  The Bank's appraiser submits that the Property has ten rooms, including four bedrooms and three and one-half baths, with 3,187 square feet of gross living area.

The Property is subject to first and second mortgages held by the Bank.  On or about December 14, 2005, the Debtors executed and delivered to the Bank a note in the original principal amount of $255,000.00 and a mortgage on the Property, which was recorded in the Carroll County Registry of Deeds at Book 2491, Page 587 ("First Mortgage").   On or about May 17, 2008, the Debtors executed and delivered to the Bank a second note in the original principal amount of $30,000.00 and a mortgage on the Property, which was recorded in the Carroll County Registry of Deeds at Book 2716, Page 330 ("Second Mortgage").

The Debtors sought relief under chapter 13 of the Bankruptcy Code on August 5, 2014 (the "Petition Date").  On their Schedule D, the Debtors valued the property at $265,000.00.  The Debtors had previously filed another chapter 13 case on April 1, 2010, Bankruptcy Case No. 10-

11475-JMD (the "Prior Bankruptcy").  In that case, the Debtors valued the Property at
$390,000.00 in their schedules, and made fifty-one of sixty monthly payments under a confirmed
chapter 13 plan that addressed the arrearages of both the First and Second Mortgages.  The Court
dismissed the Prior Bankruptcy pursuant to an order dated July 23, 2014 (Doc. No. 44), upon the
Debtors' Ex Parte Motion for Voluntary Dismissal (Doc. No. 43).  The Debtors refiled for
bankruptcy protection less than two weeks later.

 At the time of the Debtors' current bankruptcy filing, they owed $278,264.84 on the First
Mortgage and $21,716.59 on the Second Mortgage, as reflected in two proofs of claim filed by
the Bank, POC Nos. 1-2 and 2-1, respectively.[3]   The Debtors have filed a Second Amended Plan
Dated March 26, 2015 (Doc. No. 66) (the "Plan") which, among other things, does not provide
for payment of the Second Mortgage, stating it will be deemed unsecured pursuant to the
Debtors' Motion.  The Bank objected to the Plan (Doc. No. 71) in order to preserve its right to
payments under the Second Mortgage should the Court deny the Motion.  The Court has
continued the hearing on confirmation of the Plan, and the prior versions of the Plan, several
times.  Confirmation is presently scheduled for September 11, 2015.

 In addition to the disagreement between the parties and their experts regarding the
Property's room composition and gross living area, and partly as a result of those divergent
factors, the parties also disagree considerably as to the underlying value of the Property.  The
Debtors contend the Property was worth $276,300.00 as of August 29, 2014, pursuant to an
appraisal performed by Peter E. Stanhope ("Stanhope" or the "Debtors' Expert") dated
September 15, 2014 ("Debtors' Appraisal").  The Bank contends the Property was worth
$377,000.00 as of February 13, 2015, pursuant to an appraisal performed by George F. Brooks,

---

[3] POC No. 2-1 was filed on August 21, 2014 and amended on July 10, 2015.  The Bank amended the claim to
remove the prepetition arrearage included in the claim as originally filed due to a loan modification.  The Second
Mortgage claim was filed on August 21, 2014.

III ("Brooks" or the "Bank's Expert") dated February 20, 2015 ("Bank's Appraisal").  Presently, the Property is tax assessed by the Town of Wolfeboro at $367,700.00 and was assessed at $370,000.00 in 2010.  The Debtors did not provide any evidence that they ever sought an abatement of their property taxes based on the Town's valuation.

## III.    DISCUSSION

In order to void the Second Mortgage lien, the Debtors seek a finding pursuant to Domestic Bank v. Mann (In re Mann) that the Bank's Second Mortgage is wholly unsecured under §§ 506(a) and 1322(b)(2).  See Domestic Bank v. Mann (In re Mann), 249 B.R. 831, 840 (B.A.P. 1st Cir. 2000) (holding that "[p]ursuant to § 506(a) and § 1322(b)(2), and notwithstanding the antimodification provision in the latter, Chapter 13 plans may void residential real property liens that are wholly unsecured").  The Bank contends, however, that the Property is worth significantly more than the $276,300.00 claimed by the Debtors, which would prohibit modification of the Bank's lien under § 1322(b)(2).

In terms of timing regarding the amount of the Bank's claim for valuation purposes, the amount of the claim is fixed as of the Petition Date per § 502(b), which provides that "[t]he court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition."  11 U.S.C. § 502(b).  As the Court concluded in In re Cahill, "[s]ection 506(a) does not alter this scheme...."   In re Cahill, 503 B.R. 535, 542 (Bankr. D.N.H. 2013).  As of the Petition Date, the Debtors owed $278,264.84 on the First Mortgage and $21,716.59 on the Second Mortgage.  Accordingly, these are the amounts at issue in the context of this loan modification dispute.

With respect to the date of valuation of the collateral, § 506(a) provides a court with discretion to value the property looking to the "purpose of the valuation," and how the property

is to be used.  11 U.S.C. § 506(a).  These determinations are to be made "in conjunction with" any hearing relating to the use of the property or a plan that will affect a "creditor's interest" in the property.  See 11 U.S.C. § 506(a)(1).  Given the discretion of courts under § 506(a)(1) to determine how and as of what date to value collateral, a split of authority has developed regarding the proper valuation date when a chapter 13 debtor seeks to "strip off"[4] a lien as being wholly unsecured pursuant to § 1322(b)(2).   See, e.g., In re Gilpin, 479 B.R. 905, 907-08 (Bankr. M.D. Fla. 2011) (finding that a split of authority exists regarding the appropriate valuation date).  In this jurisdiction, the Court has adopted a flexible approach to valuation.  See Cahill, 503 B.R. at 540; see also In re SW Boston Hotel Venture, LLC, 748 F.3d 393 (1st Cir. 2014) (adopting flexible approach in determining whether a creditor is entitled to accrue interest under § 506(b)); but see T.D. Bank, N.A. v. Landry, 479 B.R. 1, 4, 9 (D. Mass. 2012) (holding that "the time of valuation must also be flexible—[a]lthough the amount of a creditor's claim is fixed at the petition date, there is nothing to indicate that the value of the claim must also be determined at the petition date," but ultimately finding that where the purpose of the valuation is to determine whether the claim is entitled to protection under § 1322(b)(2) valuation must take place as of the date of the case was commenced) (internal quotations omitted).  In Cahill, which involved individual chapter 11 debtors seeking to determine the secured status of their second mortgage on their principal residence, the Court applied the flexible approach and determined that valuing the property near the confirmation hearing date would provide the most accurate result as to whether the mortgagee's claim was wholly unsecured.[5]  See Cahill, 503 B.R. at 540.

---

[4]  "The term 'strip off' is colloquially used when, there being no collateral value for a mortgage, the entire lien is proposed to be avoided.  The term 'strip down' is used when, there being insufficient collateral value for a mortgage, the lien is proposed to be reduced to the value of the collateral."  Mann, 249 B.R. at 832 n.1.

[5]  Although the Cahill case involved individual debtors under chapter 11, the analysis regarding modification of secured party rights in that case stems from an identical provision in both chapter 11 and 13 of the Code, §§ 1123(b)(5) and 1322(b)(2), respectively; accordingly the analysis in Cahill is applicable to a motion to determine

The Court was persuaded that the secured creditor should receive the benefit of increases in the underlying collateral's value over the passage of time.  See id. at 541.  Circumstances in the present case would appear to dictate the same timing and, accordingly, the relevant valuation is a date close to the confirmation hearing in determining the relation of the Second Mortgage claim to the underlying collateral value for the purpose of applying § 1322(b)(2).  See id. at 540-41.  While the Debtor's Appraisal valued the Property less than three weeks after the Petition Date, and the Debtor's Expert testified that he had not done a study as to whether property values had increased since September 2014, the Bank's expert testified that the market has been stable since the Petition Date.

Furthermore, the Debtors have the burden to prove that they are entitled to strip off a lien from their principal residence.  See In re Fournier, 2014 BNH 010, 3; but see In re Heritage Highgate, Inc., 679 F.3d 132, 139-40 (3d Cir. 2012) (noting that a three-way split of authority exists regarding the burden of proof as to the value of secured claims under § 506(a) and concluding that a burden shifting paradigm should apply).

At the evidentiary hearing on the Motion, each party presented valuation evidence through the testimony and appraisal report of their respective licensed appraiser.  The appraisers used the same methodology for valuing the Property, the sales comparison approach, both concluding that the cost and income approaches were inappropriate measures regarding the Property.[6,7]  Accordingly, each conducted a physical examination of the Property and used

---

secured status in a chapter 13 case as well.  See, e.g., Granite Bank v. Cohen (In re Cohen), 267 B.R. 39, 42 (Bankr. D.N.H. 2001); see also Lomas Mortgage, Inc. v. Louis, 82 F.3d 1, 6 (1st Cir. 1996) (noting that the anti-modification language of § 1123(b)(5) is identical to that of § 1322(b)(2)).

[6] "Valuation through the comparable sales approach assumes that the properties valued by the market are comparable enough to the subject property that the adjustments by the appraiser are relatively small and that the value is primarily determined by the market, not the appraiser."  In re Ferman, 2001 BNH 028, 3.

observations gleaned from those examinations to identify a number of comparable, recently sold properties.  Since none of the comparable properties chosen were identical to the Property, each appraiser made various upward and downward adjustments to the sale prices of the comparables to account for their differences.  Each expert then determined a final value from a range of adjusted values.[8]

Both appraisers also had equivalent qualifications and significant experience in appraising residential real estate, as well as knowledge of the market and the Property.  While both witnesses were well-qualified, in the Court's view, each also disregarded or did not adequately consider material components associated either with the Property or the comparable sales used in determining the value of the Property.  The question, therefore, is which appraisal came closest to the true value of the Debtors' principal residence despite each of their significant shortcomings.

The parties are $100,700.00 apart in their valuations, the Debtors' Expert valuing the Property at $276,300.00 and the Bank's Expert valuing it at $377,000.00.  Given that the value of the Property must be $278,264.84 or less in order for the Court to find in favor of the Debtors, an extremely narrow margin of $1,964.84 (0.17%) already exists between the Debtors' asserted Property value and the amount owed on the First Mortgage.  Similar to the <u>Fournier</u> matter, the Court essentially would need to completely discount the testimony of the Bank's Expert under these circumstances.  See <u>Fournier</u>, 2014 BNH 010, 4.  Despite what it sees as certain flaws in

---

[7]  Both appraisers discounted the cost approach because of the Property's age and the lack of new construction in the area.  Additionally, they also disregarded the income approach because single family homes are not customarily rented in the area so there is a lack of documented rental data to support an income approach analysis.  The Debtors' Expert testified that even though there is an in-law suite, the Town of Wolfeboro had indicated it was not to be treated as an independent rental unit.

[8]  In the case of the Debtors' Expert, the final value was the median value of the comparable properties and, in the case of the Bank's Expert, the final value was based on the "central tendency" of his comparable values.

the Bank's comparable sales assessment, the Court is unwilling to so discount the Bank's Appraisal on the record before it, particularly where the Debtors had valued the Property in excess of the Bank's asserted value in their Prior Bankruptcy, and the Debtor's Appraisal excluded a significant portion of the gross living area of the Property without adequate justification, making the comparable sales examined in that appraisal inaccurate as well. See id. (holding, in case where the delta between the debtors' appraisal and the bank's claim totaled less than $5,450.00, that "in order for the Court to find in favor of the Debtors on the issue of value, the Court would essentially need to completely disbelieve the testimony of the Bank's Expert" who had valued the property $34,000.00 more than the Debtors).

### A.    Debtors' Evidence of Value

The Debtors' Expert testified that the value of the Property was $276,300.00 as of August 29, 2014, based on a comparable sales analysis.  He examined three properties as being comparable to the subject.  Comparable Sale 1, an eight room, three bedroom, two and one-half bath property on 1.89 acres, is located at 429 North Line Road, Wolfeboro.  That sale had closed as of November 1, 2013 and was the oldest sale he considered.   Comparable Sale 2, a nine room, four bedroom, two bath property on 2.57 acres, is located at 501 Beach Pond Road, Wolfeboro and closed on June 20, 2014.  Comparable Sale 3, a nine room, four bedroom, three and one-half bath property on 4.34 acres, is located at 6 Chandler Road, Tuftonboro.  Its sale also closed on June 20, 2014.

Stanhope made various adjustments to his comparable sales as set forth in the following table:

|  | Comparable 1<br>429 North Line<br>Road, Wolfeboro | Comparable 2<br>501 Beach Pond<br>Road, Wolfeboro | Comparable 3<br>6 Chandler Road,<br>Tuftonboro |
| --- | --- | --- | --- |

| Sale Price | $290,000 | $315,000 | $240,000 |
|---|---|---|---|
| Location | -15,000 | -15,000 | |
| Quality of Construction | -11,000 | -25,000 | |
| Site Size | +6,000 | +5,000 | +3,000 |
| View | +5,000 | +5,000 | +5,000 |
| Condition | -15,000 | -15,000 | |
| Room Count | | +2,000 | -3,000 |
| Gross Living Area | +5,200 | | -3,400[9] |
| Functional Utility | -3,000 | -3,000 | -3,000 |
| Porch/Patio/Deck | +2,000 | -3,000 | +6,000 |
| Fireplaces | -3,000 | -3,000 | -3,000 |
| Lack of In-Law Space | +20,000 | +20,000 | +20,000 |
| Age | | | +5,000 |
| Basement/Finished Rooms Below Grade | | -8,000 | |
| Garage | +6,000 | | |
| Adjusted Sale Price | $287,200 | $275,000 | $266,600 |
| Overall Percentage Adjustment | -.96% | -12.69% | 11.08% |

In determining his comparable sales, Stanhope testified that location was a primary factor, choosing two properties in Wolfeboro and one in Tuftonboro, New Hampshire.[10] Stanhope testified that the Property was outside of Wolfeboro's more desirable Lake Winnipesaukee submarket, and was instead part of a rural market. He selected comparable sales he felt were consistent with the Property in terms of what he viewed as the remoteness from the Lake Winnipesaukee market. Of the three comparable sales, the two Wolfeboro properties were

---

[9] Stanhope made a downward adjustment for a larger room count for Comparable 3, when, in reality, the room count should have been judged the same as the subject Property when the in-law space is factored in.

[10] Although the Debtors' Appraisal discusses three comparable sales in detail, the location map of the comparables references a fourth comparable located at 701 Durgin Road in Tuftonboro, 7.58 miles from the Property. The Debtors' Appraisal does not discuss this comparable further. Since there are no additional details for this comparable either in the report or on the record, the Court shall ignore it in assessing the Debtors' value of the Property.

located approximately six miles from the Property,[11] while the Tuftonboro property was located

10.41 miles from the Property.

With respect to lot size, the comparables used by Stanhope all had much smaller lot sizes

than the Property.  More specifically, the lot sizes and deviation from the Property are as follows:

Comparable Sale 1 (1.89 acres, 76% smaller); Comparable Sale 2 (2.57 acres, 67% smaller); and

Comparable Sale 3 (4.34 acres, 45% smaller).  Stanhope made upward adjustments of $6,000.00,

$5,000.00, and $3,000.00, respectively, for the smaller lots.  Stanhope testified that the

Property's lot size, although large at 7.89 acres, did not have as much utility as a lot with a one-

to-one ratio of frontage and depth, given its long and narrow "bowling alley" configuration of

300 feet of frontage and a depth of 1,000 feet.  Accordingly, Stanhope testified that use of

comparable sales with smaller lot sizes was appropriate, because they were of comparable utility

to the Property's lot.

Stanhope also stated in his report that the Property consisted of seven rooms and 2,441

square feet of gross living area, determining not to include the finished in-law quarters -- which

consisted of three rooms and approximately 840 square feet -- in either the room count or the

gross living area.[12]  Stanhope did not testify at the hearing as to why the in-law apartment was

discounted in his assessment.  His appraisal reflects, however, that he believed that the

"oversized garage and inlaw (sic) quarters … are considered overimprovements which cost more

than their contribution to value."  Debtors' Ex. 1, Debtors' Appraisal, p. 3.  Moreover, even

though he excluded the square footage from the overall gross living area of the Property and

---

[11] Comparable Sale 1 was 6.16 miles from the Property, and Comparable Sale 2 was 6.03 miles from the Property.

[12] The difference between the gross living areas used by the appraisers is 746 square feet, less than the approximate size of the in-law apartment.  This is so because the parties differed slightly on their assessments of the area included in Levels 1 and 2 of the Property.  The Debtors' Expert found Level 1 contained 1,501 sq. ft., Level 2,933 sq. ft., and Level 3, 840 sq. ft (excluded from overall tally).  The Bank's Expert determined that Level 1 contained 1,519 sq. ft., Level 2, 828 sq. ft., and Level 3, 840 sq. ft.

chose comparable sales that had significantly smaller living areas than the subject,[13] he also

made upward adjustments of $20,000.00 for each of his comparables for not having an in-law

space, which breaks down to a value of $23.81/square foot.  There is no case law to suggest that

the in-law apartment square footage should have been excluded from the gross living area

assessment.  In fact, the definition of "debtor's principal residence" and "incidental property"

under the Code suggests that such a component of property should be properly considered in the

context of valuation.  11 U.S.C. § 101(13A) ("debtor's principal residence" is defined as "a

residential structure, including incidental property, without regard to whether that structure is

attached to real property"); 11 U.S.C. § 101(27B) ("incidental property" is defined as, with

respect to a debtor's principal residence, "property commonly conveyed with a principal

residence in the area where the real property is located").  This is not a case where the apartment

is a separate income producing unit that may be excluded from the § 1322(b) analysis because it

is not considered the debtor's principal residence.  See, e.g., In re Scarborough,  461 F.3d 406,

414 (3d Cir. 2006) ("A claim that is secured by any interest in personal property or real property

that is not the debtor's principal residence may be modified in a Chapter 13 bankruptcy.")

Moreover, there are few references in the case law as to what general impact an

overimprovement should have on valuation in the context of § 1322(b)(2) proceedings when

there is no specific clarifying testimony regarding the circumstances of a particular case.  See,

e.g., In re De Leon, No. 11-56921-ASW, 2014 WL 2958171, *5 (Bankr. N.D. Cal. June 30,

2014) (noting that an appraiser described an "overimprovement" as a "residential structure [that]

was overly large and that the owners could not expect to get full value out of it upon sale, much

---

[13]  Comparable Sale 1 (30% smaller), Comparable Sale 2 (21% smaller), and Comparable Sale 3 (19% smaller).
Debtors' Expert made the following adjustments for differences in gross living area (based on the Property having
2,441 square feet) for each of the comparable sales in the following respective amounts: $5,200.00, $0, and
-$3,400.00.

like with a swimming pool").  It does not necessarily follow that a debtor will get no value for the improvement and, therefore, it is illogical to conclude that it should be excluded entirely and added back in upward adjustments in comparability assessments of smaller properties.  Even if there are factors that would suggest such an adjustment is warranted, instead of looking at similarly sized properties, the Court was not provided with such evidence from the Debtors, and it was their burden to do so.

Based on his exclusion of the in-law apartment, Stanhope used comparable sales consisting of properties ranging in size from 2,233 square feet to 2,578 square feet.  Presumably because he excluded the in-law apartment and calculated the Property's living area as being only 2,441 square feet, he made a downward adjustment of $3,400.00 with respect to Comparable Sale 3 (with 2,578 square feet of living area).  Furthermore, he made an upward adjustment of $5,200.00 for Comparable Sale 1, the smallest property analyzed (at 2,233 square feet).  While Stanhope did not make any living area adjustments to Comparable Sale 2, he did make an upward adjustment of $2,000.00 based on the room count.  Stanhope also made a downward adjustment of $3,000.00 to Comparable Sale 3 for the room count.   Excluding Comparable Sale 2, which had no living area adjustment (even though the property appears to be 75 square feet bigger than the 2,441 square foot starting number he was using), Stanhope uses a $25.00 per square foot multiplier for gross living area discrepancies between the comparable sales and the Property.

In its Objection, the Bank challenged the use of these comparable sales given the considerably smaller lot sizes and the use of a location outside of Wolfeboro for Comparable Sale 3, but did not comment on the discrepancy in gross living area.

**B.      Bank's Evidence of Value**

The Bank's Expert testified that the value of the Property was $377,000.00 as of February 13, 2015,[14] based on a comparable sales analysis of four properties that were all located in Wolfeboro.  Brooks included the in-law apartment in his assessment of gross living area and room count and found the Property consisted of ten rooms, with 3,187 square feet of gross living area.  Accordingly, three out of the four comparable sales examined by Brooks, while having smaller gross living areas than the Property, still had significantly larger dwellings than those assessed by Stanhope to arrive at his opinion of value.[15]  In order to compensate for smaller gross living areas in his comparable sales, Brooks also made larger multiplier adjustments equaling $40.00 per square foot.

Comparable Sale 1, a nine room, four bedroom, three and one-half bath property on 1.3 acres, is located at 4 Wiggin Road, Wolfeboro, and sold on September 26, 2014.  Comparable Sale 2, a nine room, five bedroom, three and one-half bath property on 1.95 acres, is located at 81 Sewall Road, Wolfeboro, which sold on September 5, 2014.  Comparable Sale 3, a ten room, three bedroom, two and one-half bath property on 2.08 acres, is located at 21 Armstrong Road, Wolfeboro, which sold on January 7, 2015.  Comparable 4, a seven room, three bedroom, two and one-half bath property located on 5 acres, is located on 63 Upper Trask Mountain Road, Wolfeboro, which sold on September 30, 2014.    The closest site to the Property out of both the Debtors' and Bank's comparable sales is the Bank's Comparable Sale 4, which is only 1.16 miles away.  The Bank's Comparable Sales 1, 2, and 3 were all in excess of eight miles from the Property (8.19, 8.53, and 8.13 miles away, respectively).

---

[14]  Brooks testified that the market had not changed significantly from 2014 to the date of his appraisal, indicating that the value as of the Petition Date would have been similar to his February 2015 assessment.

[15]  Comparable Sale 1 (1.1% smaller); Comparable Sale 2 (7.4% smaller); Comparable Sale 3 (13.9% smaller); and Comparable Sale 4 (23.7% smaller).

Brooks made the following adjustments to his comparable sales as set forth in the following table:

| | Comparable 1 4 Wiggin Road, Wolfeboro | Comparable 2 81 Sewall Road, Wolfeboro | Comparable 3 21 Armstrong Road, Wolfeboro | Comparable 4 63 Upper Trask Mountain Road, Wolfeboro |
|---|---|---|---|---|
| Sale Price | $500,000 | $395,000 | $370,000 | $375,000 |
| Quality of Construction | -10,000 | | | |
| Location | | | | -10,000 |
| View | | | | -10,000 |
| Condition | -10,000 | | | |
| Room Count | | | +3,000 | +3,000 |
| Gross Living Area | +1,400 | +9,560 | +17,720 | +30,200 |
| Basement/Finished Rooms Below Grade | | -5,000 | | |
| Heating/Cooling | | -3,000 | | |
| Garage | | | -8,000 | -3,000 |
| Porch/Patio/Deck | +5,000 | +4,000 | -4,000 | -1,000 |
| Fireplaces | -3,000 | -3,000 | -3,000 | -4,000 |
| Other | -80,000 (extra lot) | -20,000 (Barn) | | -2,000 (Out Building) |
| Adjusted Sale Price | $388,400.00 | $377,560.00 | $375,720.00 | $378,200.00 |
| Overall Percentage Adjustment | -22.32% | -4.42% | 1.55% | .85% |

Unlike Stanhope, Brooks made no adjustment for differences in age between the Property and any comparable sales. Additionally, only with respect to Comparable Sale 4 did Brooks make any adjustment for location and view. With respect to the gross living areas of the comparable sales examined by Brooks, they ranged from 2,432 square feet to 3,152 square feet and in each instance upward adjustments were made.[16]

Brooks also chose comparable sales that were situated on lots that are significantly smaller than the Property. The lot sizes he used and the deviation in size from the subject Property are as follows: Comparable Sale 1 (1.30 acres, 84% smaller), Comparable Sale 2 (1.95

---

[16] The gross living areas of the Bank's comparable sales and the upward adjustments made are as follows: Comparable Sale 1 (3,152 sq. ft., $1,400.00); Comparable Sale 2 (2,948 sq. ft., $9,560.00); Comparable Sale 3 (2,744 sq. ft., $17,720.00); and Comparable Sale 4 (2,432 sq. ft., $30,200.00).

acres, 75% smaller), Comparable Sale 3 (2.08 acres, 74% smaller), and Comparable Sale 4 (5.00 acres, 37% smaller). Unlike Stanhope, however, Brooks made no upward adjustments for the lot size discrepancies. Brooks did testify, however, that the use of the comparable sales on considerably smaller lots was appropriate because, given the depth issue with the Property, the smaller lots he examined had similar utility to the Property despite their size discrepancy.

Stanhope challenged the comparable sales used by Brooks, disagreeing with his decision not to make location adjustments, several of his view adjustments, and quality adjustments. He testified that the properties Brooks included had attributes that were far superior to the Property and which were not properly accounted for. In particular, Stanhope testified that the weight that Brooks placed on the quality of the Property's view was unfounded, stating that the view was compromised by a power line easement and deciduous growth in the summer months. Brooks was unable to challenge this assertion because he only visited the property during a time when there was significant snow cover, limiting his ability to fully view the rear of the Property other than by taking photographs from each side of the house. Also, Stanhope discounted Comparable Sales 1 and 2 because they were described as being in very close proximity to Lake Winnipesaukee and, therefore, were properly part of Wolfeboro's Lake submarket, which generated higher sale values than what Stanhope viewed as the more rural northern Wolfeboro market in which the subject Property sits.

### C.    Court's Conclusion as to Value

As the Court noted earlier, both experts testified credibly, but there were certain challenges to the assumptions used by both of them and the quality of the comparable sales chosen. Accordingly, the Court does not give equal weight to the values of the comparable sales

of the parties and both need further adjustments made by the Court.[17]  In the Court's view, Stanhope's comparable sales suffer from the fact that they do not take the in-law apartment square footage into account.  Brooks' comparable sales analysis suffers from a failure to sufficiently adjust for differences in location and view.  Since both parties agree that lot size is not a significant factor in the assessment of the Property's value given the utility issues with the narrowness and depth of the lot, the Court has disregarded that factor in examining the quality of comparable sales used by the appraisers, because both parties have essentially done so in their own assessments.

Of the comparable sales utilized by Stanhope, the Court disregards the use of a location outside of Wolfeboro and determines that of the remaining two properties, Comparable Sale 2 is the most similar to the Property and provides the Court with the Debtors' best indicator of value, subject to further adjustments.  Comparable Sale 2 is a cape that is the same age as the Property. Although Stanhope made numerous adjustments based on its location, view, lot size, room count, condition, and its various amenities (such as a finished basement, patio/deck, and fireplace), the Court shall take those adjustments as a starting point as this is still the most similar option to the Property among Stanhope's comparable sales.

Furthermore, of the comparable sales utilized in the Bank's assessment of value, the Court concludes that Brooks' Comparable Sale 3 provides the Court with the Bank's best assessment of value because the Court finds that the other comparable sales used by the Bank are

---

[17]  Moreover, the Court finds it significant that the Debtors valued the Property at $390,000.00 just five years ago in their Prior Bankruptcy, which was dismissed less than two weeks before the present case was filed, and no adjustment was made as to the Property's value until the Debtors refiled for bankruptcy in 2014.  According to their filings, the Debtors believe the value of their Property declined by $113,700.00 between 2010 and 2014.  While no testimony was provided regarding the state of the real estate market in 2010 versus 2015, the fact that the Town of Wolfeboro is still assessing the Property at $367,700.00 for tax purposes is significant.  Since both appraisal reports indicate the Property has been properly maintained, excepting normal wear and tear, it is illogical to conclude that there has been such a precipitous drop in the Property's value, and the Court declines to do so based on the record established at the hearing.

less similar to the Property than Sale 3.  Although there were numerous adjustments made by

Brooks based on its lot size, room count, and its various amenities (such as a larger garage,

superior porch, and fireplace), the Court again uses the adjustments made as a starting point as

this is still the most similar option to the Property among Brooks' comparable sales.

The relevant characteristics of these two comparable properties are as follows:

|  | Debtors' Comparable 2 501 Beach Pond Road, Wolfeboro | Bank's Comparable 3 21 Armstrong Road, Wolfeboro |
|---|---|---|
| Sale Price | $315,000 | $370,000 |
| Quality of Construction | -25,000 | |
| Site Size | + 5,000 | |
| Location | -15,000 | |
| View | + 5,000 | |
| Condition | +15,000 | |
| Basement/Finished Rooms Below Grade | -8,000 | |
| Functional Utility | -3,000 | |
| Lack of In-Law Space | +20,000 | |
| Room Count | +2,000 | +3,000 |
| Porch/Patio/Deck | -3,000 | -4,000 |
| Fireplaces | -3,000 | -3,000 |
| Gross Living Area | | +17,720 |
| Garage | | -8,000 |
| Adjusted Sale Price | $275,000 | $375,720 |
| Overall Percentage Adjustment | -12.69% | 1.55% |

Both comparable sales, however, require further adjustment to value given the material

issues previously noted by the Court.  The Court, therefore, will combine the characteristics of

these two comparables to make a hybrid comparable property using the Debtors' and Bank's

experts own adjustment values.  Where each expert made different adjustments to the same

feature, the Court will average the values to determine the proper adjustment value.

Additionally, where one expert did not consider a factor as being applicable, the Court will make

an assessment whether some adjustment should have been made given the testimony provided.

Additionally, given the gross living area discrepancies, the gross living area calculation will be further adjusted in order to obtain an accurate assessment of value. Both appraisers used different per square foot multipliers when adjusting the gross living area. Stanhope applied different multipliers to adjust for the differences in gross living area for his three properties without testifying as to the rationale for the discrepancy. With respect to Comparable Sale 2, he chose not to apply any multiplier at all, even though the property was 75 square feet larger than the 2,441 square foot number he used. Brooks used a $40.00 per square foot multiplier to adjust for the difference in size between the Property and Comparable Sale 3. These multipliers used by the appraisers are far apart and have no utility in determining an approximate, accurate value for the Property. Accordingly, the Court will instead average the sale price per square foot for each of the comparable properties as they are closer in value, which results in a multiplier of $130.02.[18] The Court will use this figure multiplied by the 3,187 gross living area, which takes into account the 840 square feet of living area in the in-law apartment, resulting in a starting value of $414,373.74 for the Property.[19]

Upon application of the adjustments discussed and resolution of disputed features of the Property, the Court concludes that the adjusted sales price of the Property, once the hybrid comparable is taken into account, is as follows:

| The Property | Hybrid Comparable | Adjustments |
|---|---|---|
| Value of Adjusted Gross Living Area | -- | $414,373.74 |
| Average Construction | Good Construction | -25,000[20] |

---

[18] The calculation is as follows: ($125.20+$134.84)/2=$130.02.

[19] With respect to the hybrid comparable, since there has already been an adjustment for the square footage of the in-law apartment in the gross living area of the property, the separate upward adjustment for the in-law apartment of $20,000.00 made by Stanhope to Comparable Sale 2 and the upward adjustment of $17,720.00 made by Brooks to the gross living area to Comparable Sale 3 shall be disregarded.

[20] Regarding Stanhope's challenge to Brooks' assessment of the construction quality of Comparable Sale 3, the Court finds that some adjustment should be made regarding quality because of Stanhope's testimony that this

| Average Location | Closer to Town | -17,500[21] |
|---|---|---|
| Local Mountain View | Woods/Neighborhood[22] | |
| Average Condition | Similar Condition[23] | |
| 4 Bedrooms/3.1 Baths | 3 Bedrooms/2.1 Baths[24] | |
| Unfinished Ceiling/Typical Functional Utility | Typical Functional Utility[25] | |
| Basement/Finished Rooms | Full/Unfinished[26] | |

comparable sale had a quality factor of 20 versus the Property's factor of 10, which was not adequately rebutted by Brooks. Stanhope testified as to "quality factors," but did not specify which attributes of the Property that the quality factor related to. The Court determines that using the Debtors' full adjustment for good construction quality of their comparable is sufficient to address the construction quality component of value.

[21] The Court will also make an adjustment for the location of the Bank's Comparable Sale 3 because, although Brooks determined it was not necessary to adjust for location in his appraisal, both Stanhope and Brooks testified that this property was within walking distance of Lake Winnipesaukee and its marina. The difference between that property and the Debtors' Property, which is approximately eight miles from the lake, must be accounted for by some measure. Since Stanhope made a $15,000.00 adjustment for his Comparable Sale 2 for being closer to the center of town, approximately six miles away from the Property, it would make sense that a similar adjustment is made to the Bank's Comparable Sale 3. Given the property's proximity to Lake Winnipesaukee, the Court finds that the Bank's Comparable Sale 3 should be adjusted downward $20,000.00 for its location. Averaging the two location adjustments results in a $17,500.00 downward adjustment for location regarding the hybrid comparable.

[22] With respect to the view, the Court recognizes that Brooks did not get the benefit of seeing the view from the Debtors' Property first hand given the snow blocking his accessibility, but given there was still a mountain view and the comparable location only had a neighborhood view, the lack of adjustment for that factor is not problematic, particularly given the location adjustment that has been made for the property's proximity to the Lake area. Moreover, even though Stanhope made an upwards adjustment of $5,000.00 to the Debtors' Comparable Sale 2 for what he determined to be an inferior view of the comparable sale versus the Property, the Court will not make an adjustment in the context of the hybrid comparable because it would only serve to push the adjusted value of the Property higher, which would have no impact on the outcome of this case.

[23] Brooks did not make an adjustment to Comparable Sale 3 because he concluded its condition was similar to the Property. Stanhope made a $15,000.00 downward adjustment to the Debtors' comparable for this item. Since the Bank's comparable sale property aligns with the Property on this feature and no party has challenged this assessment, no adjustment will be made.

[24] The Debtors and the Bank both made upward adjustments of $2,000.00 and $3,000.00, respectively, given that each of the comparables had smaller room counts than the Property. However, the Court finds that no positive adjustment needs to be made for room count given that the gross living area has already been separately adjusted for and now takes into account the missing square footage, which subsumes the room count adjustments.

[25] Given the references made by the parties regarding the functional utility line item in their appraisals, it is unclear whether they were comparing similar items. Stanhope described the Property's functional utility as consisting of an unfinished ceiling, but described the Debtors' Comparable Sale 2 as having an "average" functional utility and making a $3,000.00 downward adjustment for the purported difference. Brooks described both the Property's and the Bank's Comparable Sale 3 as having "typical" functional utility. No testimony was given regarding functional utility and without more, the Court will not make a further adjustment for this feature on account of the hybrid comparable, essentially adopting the Bank's assessment on this feature.

[26] Brooks did not make an adjustment to Comparable Sale 3 because the property also had an unfinished basement similar to the Property. Stanhope made an $8,000.00 downward adjustment to the Debtors' comparable for this item because it included a "FR Bar." Since the Bank's comparable sale property aligns with the Property on this feature and no party has challenged this assessment, no adjustment will be made.

| Below Grade | | |
|---|---|---|
| 2 Car Garage | 2 Car Garage[27] | |
| Screened in Porch/Porch | Porch/Patio/Deck | -3,500[28] |
| No Fireplaces | Fireplace | -3,000[29] |
| **Adjusted Value** | | **$365,373.74** |

Accordingly, the Court's adjusted value of $365,373.74 exceeds the $278,264.84 balance due on

the First Mortgage.[30]  The Court does not find that the definitive fair market value is

$365,373.74, but only that the evidence presented supports a finding that the value of the

Property is in excess of the $278,264.84 value of the Bank's First Mortgage.  Given the

imprecise nature of valuing real estate, even before the Court closely examined the evidence

provided by the parties, the margin of error in the Debtors' Expert's appraisal was less than

0.71% and, ultimately, that was simply too big a valuation hurdle for the Debtors to overcome.

See Fraize v. Beneficial Mortg. Corp. of NH (In re Fraize), 208 B.R. 311, 313 (Bankr. D.N.H.

1997) (noting that "valuation" is "less than an exact science").  The Court finds the Debtors have

not met their ultimate burden of persuasion to support a finding for their $276,300.00 value.

## IV.     CONCLUSION

The Court concludes that the Property is worth in excess of the $278,264.84 value of the

Bank's First Mortgage on the Petition Date.  Accordingly, the Debtors' Motion must be denied

because the anti-modification provision of § 1322(b)(2) applies with respect to the Bank's

---

[27]  Stanhope did not make an adjustment regarding the garage feature in the Debtors' Comparable Sale 2 because it had a two car garage just like the Property.  Brooks, on the other hand, made an $8,000.00 downward adjustment because Bank's Comparable Sale 3 included a four car garage. Since the Debtors' comparable sale property aligns with the Property on this feature and no party has challenged this assessment, no adjustment will be made.

[28]  Average of Debtors' (-$3,000.00) and Bank's (-$4,000.00) downward adjustments.

[29]  The Debtors and the Bank used the same adjustment figure for this item.

[30]  Even taking an average of $275,000.00, the adjusted sales price for Stanhope's Comparable 2, and $375,720.00, the adjusted sales price for Brooks' Comparable 3, would result in the value of the Property being $325,360, which is well in excess of the First Mortgage balance.

Second Mortgage and the Debtors cannot avoid the Bank's Second Mortgage residential lien. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate order consistent with this opinion.

      ENTERED at Manchester, New Hampshire.

Date:   September 10, 2015         /s/ Bruce A. Harwood
                                          Bruce A. Harwood
                                          Chief Bankruptcy Judge